UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                      )
NEIL W. DIAS,                         )
                                      )
                Plaintiff,            )
                                      )
v.                                    )          Civil Action No. 10-10496-NMG
                                      )
VERIZON NEW ENGLAND, INC.,            )
                                      )
                Defendant.            )
_____ )
```

REPORT AND RECOMMENDATION ON
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

August 3, 2012

SOROKIN, C.M.J.

Currently pending is the Motion for Summary Judgment of the Defendant, Verizon New

England, Inc. (Docket # 29).

For the following reasons, I RECOMMEND that the Court ALLOW the Defendant's

motion IN PART and DENY it IN PART.

I.      FACTUAL AND PROCEDURAL BACKGROUND[1]

The Plaintiff, Neil W. Dias, brings three claims against Verizon pursuant to M.G.L.

c. 151B, each arising from his employment by Verizon and his November, 2008 termination

(ostensibly part of a reduction in force).  Docket # 1-1.  Dias is a black male of Cape Verdean

---

[1] Additional facts will be recited _infra_ where relevant to the discussion.

1

descent.  Id. at ¶ 5.  Count I of his Complaint alleges a hostile work environment.  Id. at ¶¶ 20-26.

Count II alleges discrimination by Verizon on the basis of Dias's race.  Id. at ¶¶ 327-33.  Count

III alleges a retaliatory discharge and other retaliatory conduct. Id. at ¶¶ 34-40.

Events at the Brockton Garage

In May 1996, Dias began working for Verizon as a line worker in Rhode Island.  Docket #

31 at ¶ 3.  Verizon provides telecommunication services to its customers.  Id. at ¶ 2.  In about

January 2004, Verizon promoted Dias to a first level manager position in the Installation and

Management department in Verizon's Brockton, Massachusetts garage.  Id. at ¶ 4.  In this

position, Dias reported to James Fennell, a second level manager.  Id. at ¶ 5.  Malcolm Benvie

and Anne Best were two other first level managers in the Brockton garage at that time, also

reporting to Fennell.  Id. at ¶ 6.  Dias had strained working relationships with both Benvie and

Best.  Id. at ¶ 7.  Dias alleges that Benvie and Best made comments regarding his race either to

him or in his presence, made race-based jokes in his presence, and spoke critically of affirmative

action programs in his presence.  Id. at ¶ 8.  In particular, Dias alleges that in February or March

2004, Benvie told Dias that "my people will never be equal to him."  Id. at ¶ 9.  The Parties

dispute whether Benvie's remarks referred to Dias's race (as Dias believes) or to his lack of

seniority with Verizon.

Dias complained to Fennell that Benvie manipulated the workload so that Benvie's

technicians would perform the easier work and so that the more difficult work would be assigned

to Dias (thus improving Benvie's productivity numbers at Dias's expense).  Id. at ¶ 10.  Dias

alleges that he complained to Fennell as well concerning Best and Benvie's racial bias.  Docket #

40-2 at 65.  The Parties dispute the sufficiency of Fennell's investigation of Dias's complaint.

Dias concedes only that Fennel spoke to Benvie about the issue concerning the technicians and accepted his denial of wrongdoing. Docket # 40 at ¶ 12. Dias maintained that he made frequent inquiries to Fennell concerning the status of his investigation of racially insensitive remarks, and was told only that Fennell was "looking into it," with no resolution despite repeated follow-ups. Id. at 11; Docket # 40-2 at 65. He alleges that he escalated his complaints to Fennell's supervisor as well, and received no satisfaction. Docket # 40 at 11. Dias further alleges that Fennell's administrative assistant (who is white) witnessed the racial harassment of him by Benvie and Best and she testified that she believed they were harassing him by singling him out and making his job difficult. Docket # 40-11 at 17-18. She further testified that she herself complained to Fennell on at least five occasions about Best and Benvie's treatment of Dias and another black employee – treatment which she characterized as "out of control." Id. at 37-38. Fennell's response was that he was "not getting in the middle. Let them [sic] hash it out himself." Id. at 38.

In December 2004, while Dias was on vacation, Best suspended one of Dias's technicians for poor job performance. Docket # 31 at ¶ 13. The suspended employee telephoned Dias and told him that Best had disciplined him. Dias telephoned Fennell's secretary and asked her to inform Fennell that Dias (who was on vacation) was on his way to the garage. Id. at ¶ 14. Dias also telephoned Best and, using vulgar language, chastised her for the fact that she and Benvie were "beating up on my techs every time I am on vacation." He also told her that he was sick of them both, that they needed to leave him alone and that he was coming up there to end the situation. Docket # 40 at ¶ 15 (citing Docket # 32-1 at 18).

Best informed Fennell that she felt threatened by Dias's phone call, and Fennell contacted

Dias and instructed him not to come to the Brockton garage that day. Docket # 31 at ¶ 17. Verizon's security department investigated Best's complaint against Dias. Id. at ¶ 18. In his written statement to security, Dias admitted swearing at Best during the telephone call but denied intending to threaten her. Id. at ¶ 19. The investigator concluded that Dias used profanity, but not that he threatened Best. Docket # 40-12 at 41. During the pendency of the investigation, Fennell temporarily transferred Dias to a garage in Plymouth. Docket # 31 at ¶ 20. Dias received a written warning concerning the incident with Best. Id. at ¶ 21.

In February, 2005, Dias made a complaint with Verizon's Equal Employment Opportunity Office which included the allegation that Best and Benvie had discriminated against him on the basis of his race and age throughout 2004. Id. at ¶ 26. Dias wrote that Benvie had told him that, "[w]e are not equal people nor will we ever be equal in any way, you will never be like me!" Docket # 41-15 at 4. Dias characterized this as "a racial statement." Id. He also wrote that Best was vocal with respect to her problems with minorities in the garage. Id. at 6. Dias wrote that Best expressed her opposition to diversity and affirmative action initiatives generally and that she specifically criticized one black employee by stating to Dias, "you tell me in what way does the company benefit by hiring a black person that is dumb?" Id. Dias described Benvie making similar remarks. Id. at 7 ("they got [sic] to have so many of those people and most of them are not close to being qualified, that's diversity for you").

Paul McGovern, an EEO investigator in Verizon's EEO Compliance Group, investigated Dias's complaint, but did not interview Best, Benvie, or Best's daughter (whom Dias had also named as discriminating against him). Docket # 41-4 at 69-71. Nonetheless, McGovern concluded that Dias's racial complaints were "unfounded." Docket # 32-5 at 4. In a

memorandum to the file dated October 5, 2005, McGovern concluded that there was "[n]o EEO violation" and that "while there is no showing that Benvie's treatment of Dias was motivated by race, Benvie made statements to Dias ('you people will never be equal to me') which review establishes referred to job knowledge and years of service. Investigation corroborates that Benvie's manner is caustic to peers and associates regardless of race." Docket # 41-15.

On February 27, 2007 (two years after McGovern's memorandum to the file finding the complaint to be unfounded), Dias sent an email to McGovern in which he wrote that McGovern had told him in August 2006 that the investigation was completed, but which also strongly suggests that Dias had not been made aware of any finding. See Docket # 43-3 at 2 ("I would like (in writing) to have the results of my investigation meaning, was my complaint justified? . . . I would like (in writing) what was the conclusion"). McGovern testified that he had told Dias not only that the investigation was complete, but that the claim of race discrimination was found to be unfounded. Docket # 32-5 at 4. Dias testified that Verizon never informed him of this decision despite his repeated inquiries. Docket # 41-2 at 131-32.

Events at the New Bedford Garage

In February 2005, Verizon permanently transferred Dias to the New Bedford garage, where he retained the position of first level manager with the same salary and benefits. Id. at ¶¶ 22-23. In his new assignment, Dias reported to second level manager Patricia Regan. Id. at ¶ 25.

Regan and Dias had different approaches to managing technicians. Id. at ¶ 28. Regan's approach emphasized discipline, while Dias viewed his own approach as more positive and inspirational. Docket # 40 at ¶ 28 (citing Docket # 32-1 at 36). Dias alleges that although his EEO complaint had not had anything to do with Regan, she nevertheless expressed displeasure at

his having filed a complaint. Docket # 31 at ¶ 29. He alleges that because she disapproved of his EEO complaint, Regan denied him certain training opportunities and refused to let him attend several diversity seminars and conferences. Id. at ¶ 31. Regan denies knowing that Dias had made a complaint. Id. at ¶ 29. Regan told Dias that she could not honor certain of his requests because their department was extremely busy and the needs of the business came first. Id. at ¶ 32.

Dias encountered no race-based comments while at the New Bedford office, whether by Regan or any other individuals. Id. at ¶ 30. Dias does contend that Regan was more abrasive toward him than toward other managers (although he admits that she yelled at other managers) and that she threatened his job while he worked for her. Id. at ¶¶ 34-35.

In Dias's 2005 Year-End Performance Assessment, Regan assigned Dias a rating of "performing," the middle of the three available rankings. Id. at ¶ 36.[2] Regan also noted in the 2005 Year-End Performance Assessment that Dias would need to "develop his management skills to get the most out of his technicians." Id. at ¶ 38. Dias made no complaint about his 2005 Year-End Performance Assessment. Id. at ¶ 39. In approximately November, 2006 Dias received from Regan a mid-year development review for 2006, in which Regan stated that Dias "will have to continue to hold his technicians accountable." Id. at ¶ 40. Dias refused to sign the review because he believed it was "too negative." Id. at ¶ 41. Dias concedes that he did not meet all of the objectives set for him in the first half of 2006. Id.

During his tenure in the New Bedford garage, Dias applied for several other positions with Verizon. Id. at ¶ 42. In approximately June, 2006, Verizon reassigned Dias to a control foreman position in South Boston, a position for which he had not applied. Id. at ¶ 43. Dias contends that

---

[2] "L" for leading was the highest ranking with a "P" for performing as the next highest rank followed by "D" for developing. Id. at ¶ 37.

this reassignment was in retaliation for filing his complaints with the EEO office.  Id. at ¶ 44.

Dias complained both to Fennell and to Marianne Ryan, a Director in the Construction

Department.  Id. at ¶¶ 45-47.  Ryan told Dias that there was a first level manager position in the

Brockton garage and Dias requested reassignment to Brockton instead of South Boston.  Id. at ¶¶

48-49.  As a result, Verizon reassigned Plaintiff to a first level manager position (also known as a

splice foreman) in the Construction department in the Brockton garage, to which he first reported

in approximately July, 2006.  Id. at ¶¶ 50, 55.  Dias received the same pay and benefits following

his transfer.  Id. at ¶ 51.  As a result of his reassignment to the Brockton garage's Construction

department, Dias reported to second-level manager Paul McCarthy.  Id. at ¶ 56.

At about the same time, Laurie MacDonald also began work as a first level manager in the

Brockton garage.  Id. at ¶ 57.  MacDonald had previously worked temporarily as a second level

manager in the Construction department managing approximately four first level managers and

one hundred technicians.  Id. at ¶ 58.  In other prior positions, MacDonald was a temporary FiOS

project manager for the Massachusetts Construction department and a temporary second level

manager for the Rhode Island Construction department.  Id. at ¶¶ 59-60.  Dias concedes that

MacDonald's prior management experience enabled her to be an effective first level manager

when she joined the Brockton garage in July 2006 and that her prior experience managing

construction technicians "greatly aided her performance."  Id. at ¶ 62.

In approximately July 2006, McCarthy met with Dias and MacDonald and provided

objectives for the remainder of the year.  Id. at ¶ 63.  Dias affirms that McCarthy explained that

he and MacDonald were to "work as a team throughout the year" and that they would "rise

together or fall together."  Docket # 41-3 at ¶ 5.  McCarthy added that because MacDonald was

new to the job, Dias would need "to go out into the field for her and do that part of her job for her because she did not have that type of outside construction experience." Id.

On February 20, 2007, Dias received his 2006 Year-End Performance Review from McCarthy in which McCarthy gave Dias a "developing" rating. Docket # 31 at ¶ 65. A "developing" rating means that an "[e]mployee met some but not all objectives, requirements and expectations, improvement needed. Or, hired within 6 months, recently promoted." Id. at ¶ 66. It is the lowest ranking and the ranking Regan gave Dias for 2005. McCarthy told Dias that he had rated him as "developing" because Dias had been a manager with the Brockton construction team for less than six months. Id. at ¶ 67. Dias received a salary increase and bonus after receiving his 2006 Year End Performance Assessment. Id. at ¶ 69.

McCarthy assigned a "performing" rating to MacDonald in her 2006 Year End Performance Assessment. Id. at ¶ 71. McCarthy affirms that he assigned a "performing" rating to MacDonald because her prior management experience in the Construction department enabled her to be an effective first level manager more quickly than Dias. Id. at ¶ 70 (citing McCarthy Affidavit, Docket # 34 at ¶ 19).

On February 20, 2007 (the same day he received his 2006 review), Dias complained to Ryan via email. Id. at ¶ 70. Ryan reviewed the evaluation, spoke to McCarthy and concluded that the assessment of Dias was appropriate. Id. Soon thereafter, on approximately March 9, 2007, Dias filed a charge of discrimination with the Massachusetts Commission Against Discrimination (MCAD) asserting claims of race and age discrimination retaliation, and harassment based upon his race, color, and age since 2004. Id. at ¶ 72; Docket # 35. This charge also encompassed the alleged racial discrimination from 2004 Dias claims Best and Benvie

inflicted.  Docket # 35 at 5.

For "a brief period of time" in early 2007, Dias reported to another second level manager in the Construction department, Jean Galanis.  Docket # 31 at ¶ 74.  On about May 7, 2007, Dias received a Summary First Quarter Review from Galanis, in which she stated that Dias's leadership abilities were lacking, an assessment with which Dias disagreed.  <u>Id.</u> at ¶ 76.  Dias does not allege that he was subjected to any discriminatory acts by Galanis.  <u>Id.</u> at ¶ 75.  He does allege that Galanis's negative performance review was in retaliation for his complaint to Verizon's EEO office, although he acknowledges that Galanis never made reference to that complaint.  <u>Id.</u> at ¶ 77.

<u>Events at the Plymouth Garage</u>

In August 2007, McCarthy reassigned Dias to the Plymouth garage to fill an open first level line manager position.  <u>Id.</u> at ¶ 78.  Dias had a new title when he reported to the Plymouth garage, but received the same pay and benefits and continued to report to McCarthy.  <u>Id.</u> at 79.  On August 27, 2007, the first day that Dias was scheduled to report to the Plymouth garage, he took an emergency day off.  <u>Id.</u> at ¶ 81.  Dias reported to the Plymouth garage on August 28, 2007, and then took a leave of absence beginning on August 29, 2007.  <u>Id.</u> at ¶ 82. Dias contends that when he telephoned McCarthy to inform him of his leave of absence, McCarthy called him "pathetic" and hung up on him.  <u>Id.</u> at ¶ 83.  On the following day, McCarthy visited Dias's home to check on him, accompanied by Katherine Bertolino, another first level manager reporting to McCarthy.  <u>Id.</u> at ¶ 84.  Verizon managers regularly conduct such home visits to check on subordinates who are out on leave, and McCarthy has done so in the past on a number of occasions.  <u>Id.</u> at ¶¶ 85-86.  Dias contends that McCarthy "stormed" at him as he

returned to his home from a doctor's appointment, took a doctor's note out of his hand, and again called him "pathetic." Id. at ¶ 88. McCarthy and Bertolino describe the interchange differently. Id. at ¶¶ 89-90.

In October, 2007, Dias returned from his leave of absence and reported to the Plymouth garage. Id. at ¶ 91. On October 16, 2007, Dias emailed McCarthy to inform him of his concerns about working in the same garage as Benvie. Id. at ¶ 92. During this conversation, McCarthy reassured Plaintiff that he and Verizon would not tolerate any employee being subjected to harassment. Id. at ¶ 93. During the time he worked in the Plymouth garage, Dias did not encounter any difficulties with Benvie. Id. at ¶ 94.

October, 2007 Accident

On October 26, 2007, while Dias was on vacation, a Verizon technician was killed while on the job. Id. at ¶ 96. MacDonald was the first manager from the Construction department to arrive at the accident scene. Id. Dias reported to the accident scene because he believed it was his job to be there. Id. at ¶ 97. McCarthy spoke with MacDonald while she was at the accident scene and based upon the conversation told her to have everyone from the Construction department leave the accident scene, including Dias, because he did not want to create any additional confusion and he wanted the scene to be free of unnecessary workers. Id. at ¶ 98. On October 29, 2007, Dias sent an email to McCarthy criticizing in personal terms McCarthy's handling of the accident scene. Id. at ¶ 99; Docket # 41-27. In the email, Dias wrote inter alia:

> sir, this was not a time for separation of departments, but a time to be unified as to help and support one another . . . once again you treated me like I do not exist . . . you continue to disrespect, discriminate and retaliate against me . . . I've had to deal with you calling me friggin pathetic when I call out ill, taking money from me and my family by not providing me with the raise and bonus I well deserved, providing me with an unjustified and discriminating performance rating, removing me (with no

reason at all) from a previous (approved) on call duty list, belittling me, embarrassing me by kicking me out of a meeting for no reason, ignoring me as you pass me by, trying to intimidate me (when asking a question), threatening my employment at Verizon, calling me a liar and many other unethical performances.

Id.

McCarthy was upset by Dias's email and expressed his displeasure to him. Id. at ¶ 101. Dias characterizes this disagreement as being unrelated to his race, but in retaliation for his prior complaints of discrimination. Id. at ¶ 102; Docket # 40 at ¶ 102.

In or around October 2007, McCarthy approved overtime timesheets submitted by Dias. Id. at ¶ 103. McCarthy's supervisor John Puopolo, told McCarthy that Dias's overtime time sheets did not provide the level of detail required of all managers in order to be processed for payment. Id. at ¶ 104. McCarthy asked Dias to provide additional detail on his timesheets, such as the required number of technicians, a description of the project, the time he arrived at the scene, and the time he left the scene. Id. at ¶ 105. There was a delay in payment of Dias's overtime, and Dias filed a complaint with the Massachusetts Attorney General's office for non-payment of wages. Docket # 40 at ¶ 107. Dias was eventually paid for all overtime worked. Docket # 31 at ¶ 107.

In December, 2007, McCarthy took action that Dias found to be adequate in response to a racial comment made by a Verizon employee in Dias's presence. Id. at ¶¶ 109-112. In June, 2008, McCarthy and Dias had a confrontation over overtime by Dias's technicians, who spent 3.5 hours on a job which McCarthy believed should have taken one hour to complete. Id. at ¶¶ 129-130. Dias alleges that McCarthy yelled at him and threw the timesheets at him when informed of the actual amount of overtime. Id. at ¶ 132. In response to Dias's complaint to Verizon's corporate security, McCarthy apologized to Dias. Docket # 32-2 at 39-40.

In approximately October 2008, McCarthy learned that Verizon would be conducting a reduction in force that would impact his first level managers. Docket # 31 at ¶ 141. Puopolo had McCarthy and other second level managers rank their first level managers from best to worst performers. Id. at ¶¶ 142, 144. McCarthy did not know how many first level managers would be included in the reduction at the time he created this ranking. Id. McCarthy ranked Dias second-to-last among his first level managers. Id. at ¶ 142. During a meeting with all second level managers under Puopolo's direction, a list of first level managers to be laid off was developed. Id. at ¶ 145. In this meeting, all second level managers went through their list of managers and discussed each of the first level managers who were selected for layoff. Id. at ¶ 147. The second level managers' assessments of their first level managers were subject to review, comment, and correction by the other managers in the meeting. Id. In explaining why Dias was ranked second to last on his list, McCarthy said that Dias was not meeting his productivity objectives, was not a strong leader, was not a team-player and was not engaged as a manager. Id. at ¶ 148. On November 13, 2008, Dias was informed that his position was going to be eliminated. Id. at ¶ 155. His termination became effective on December 13, 2008. Id. at ¶ 156. Since November 2008, Verizon has not hired a first level manager for the Construction department in the Plymouth, Massachusetts garage. Id. at ¶ 159. Dias alleges that his termination was in retaliation for his protected activity, but not that it was related to his race.

Verizon now moves for summary judgment pursuant to Fed. R. Civ. P. 56, asserting that there are no genuine disputes of material fact and that it is entitled to judgment as a matter of law.

12

II.     DISCUSSION

Standard of Review

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).    Once a party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who "may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial." Barbour v. Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir.1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).  Moreover, the Court is "obliged to view the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor."  LeBlanc v. Great American Ins. Co., 6 F.3d 836, 841 (1st Cir.1993).  Even so, the Court is to ignore "conclusory allegations, improbable inferences, and unsupported speculation." Sullivan v. City of Springfield, 561 F.3d 7, 14 (1st Cir.2009).

A.      Count III - Retaliation - Wrongful Discharge

Prima Facie Case - Causation

An employer may not "discharge, expel or otherwise discriminate against any person . . . because he has filed a complaint, testified or assisted in any  proceeding under section five." M.G.L. c. 151B, § 4(4).  Dias alleges that Verizon terminated him in retaliation for his protected activity.   In the absence of direct evidence of a retaliatory motive,[3] a plaintiff seeking to prove retaliation under the Massachusetts Civil Rights Act has the "burden of establishing a prima facie

---

[3] For purposes of this Report and Recommendation, I assume that Dias lacks direct evidence of retaliatory animus though two of McCarthy's statements seem to indicate some retaliatory animus.  See infra at 17-18 (describing McCarthy's statements about Dias to disability insurer and to Verizon's internal security personnel).

case of retaliation, and, in the wake of the defendant's introduction of nonretaliatory reasons for the various actions taken, the burden of proving that the articulated nonretaliatory reasons were pretext." Mole v. University of Massachusetts, 442 Mass. 582, 591 (2004).

To make out his prima facie case, Dias must show that he engaged in protected conduct, that he suffered some adverse action, and that a causal connection existed between the protected conduct and the adverse action. Id. at 591-92.

Verizon does not contest that Dias engaged in protected activity within the meaning of chapter 151B, and thus the first prong of Dias's claim is satisfied.[4] Plainly, Dias's termination is an adverse employment consequence. Verizon asserts, however, that Dias cannot make out a prima facie case of retaliation because he cannot demonstrate a causal relationship between his protected activity and the termination.

Verizon argues that Dias's termination was part of a reduction in force, which occurred thirteen months after his most-recent protected activity (the October 29, 2007 email), and that certain positive developments in Dias's employment (such as a positive performance review and salary increase) had the effect of breaking the causal chain between Dias's protected activities and his termination such that Dias cannot hope to prove causation at trial.

McCarthy affirms that he learned in October 2008 that Verizon would be conducting a reduction in force that would impact first level managers under his supervision. Docket # 34 at ¶ 59. Acting on instructions from his supervisor, Puopolo, McCarthy ranked his first level managers from best to worst, not knowing as he did so how many first level managers would

---

[4] At least for purposes of the summary judgment moment, Verizon conceded at the July 26, 2012 hearing on the motion that Dias's October 29, 2007 email to McCarthy concerning the incident on the day the Verizon worker was killed constituted protected activity.

be laid off.  Id. at ¶ 60.  He ranked Dias second-to-last.  Id.  At a subsequent meeting with all second level managers under Puopolo's supervision in attendance, a list of first level managers to be laid off was developed.  Id. at ¶ 61.  McCarthy affirms that the meeting attendees "considered the future needs of Verizon, and the Construction department in particular, and tried to determine which first level managers best fit those needs."  Id. at ¶ 61.  He notes that the second level managers' assessments of their first level managers were subject to review, comment, and correction by the other managers in the meeting.  Id. at ¶ 62.  McCarthy affirms that he explained at the meeting that he ranked Dias second-to-last because Dias:

> was not meeting his productivity objectives (which he did not), was not a strong leader (i.e., he would allow his technicians to dictate the terms of the work rather than control their output as evidenced, for example, by his inability to control his technicians' overtime in June 2008), was not a team-player (i.e., inwardly-focused on his own assignments and more concerned about preserving his own status, equipment and reports rather than sharing resources collaboratively) and that Plaintiff was not engaged as a manager (i.e., when I would ask about the status of a project, Plaintiff would say that he needed to speak with the technicians before he could respond)

> Id. at ¶ 63.

He added that he was concerned that because Dias "struggled to manage a relatively small team of technicians" (as evidenced particularly by his mismanagement of his technicians' overtime in June-July, 2008), he would have difficulty succeeding in the re-formed Construction department following the layoffs.  Id. at ¶¶ 65-66.  None of the other participants disagreed with the views of Dias which McCarthy expressed at the meeting.  Id. at ¶ 66.

Verizon's argument that the lack of temporal proximity between Dias's latest protected activity (i.e., his October 29, 2007 email) and his November, 2008 termination – when combined with his positive performance review and salary increase  – demonstrate that Dias has no reasonable expectation of proving causation would be more compelling were the record otherwise

devoid of evidence from which the jury might reasonably infer retaliatory animus on the part of McCarthy. This is not the case, however. The summary judgment record is replete with such evidence, dating from both prior to and subsequent to the email in question.

The records of Verizon's short-term disability carrier reveal that before McCarthy received Dias' October 29, 2007 email, McCarthy, on September 18, 2007, contacted the insurance carrier and made reference to Dias's having "a history" and expressed the view that Dias was not ill. See Docket # 40-8 (records of the insurer). McCarthy's reference to Dias having a history must refer either to a history of malingering (of which there is no evidence before the Court) or to a history of complaining about discrimination. A jury could reasonably conclude that this action revealed retaliatory animus on the part of McCarthy toward Dias. Notably, McCarthy denied any recollection of expressing an opinion to the insurance carrier as to the validity of Dias's illness. Docket # 40-22 at 24-25.

Similarly, McCarthy had visited Dias's home when Dias was on leave in August, 2007. Although there is undisputed record evidence that McCarthy and other Verizon supervisors made such visits to employees' homes on other occasions, McCarthy advanced a reason for choosing to make this particular home visit which appears to be unsupported by the record evidence. He testified that he did so because Dias was a "no show, no call" for two days. Docket #40-21 at 123-24, 128-29. ("he did not report to work, nor did he call me. The next day he did not report to work, nor did he call me . . . if I spoke to Neal, I probably wouldn't have made the home visit"). However, there is competent record evidence from which a jury could reasonably conclude that Dias did in fact communicate with McCarthy, both by email and by telephone, on the days in question. See Docket # 40-23 (showing calls, on the days in question, from Dias' cell phone to

McCarthy's cell phone and from McCarthy's cell phone to Dias' cell phone); Docket # 40-21 at 128 (in which McCarthy, having reviewed an email exhibit and having been asked, "Did you talk to him on the day you went to visit him?" answers, "Apparently, I did").

Verizon argues that the gravamen of the October 29, 2007 email from Dias to McCarthy was not his complaints of discrimination or retaliation, but rather Dias's expression of more benign workplace disputes, with complaints of discrimination  sprinkled throughout merely as "buzzwords."  While certainly not the central focus of his email, Dias nevertheless makes frequent and specific reference to his perception that McCarthy had been discriminating against him and retaliating against him.  Docket # 40-28.  Significantly, within ninety minutes of receiving the email from Dias, McCarthy forwarded it to Pupolo and expressed a desire not to work with Dias any longer (a request which Dias had also made).  Id.

During the period between the October 29 email and the termination, all was not well between Dias and McCarthy.  Dias testified that also in October, 2007, McCarthy disallowed him (and no other first level manager) from being on the overtime "call out list."  Docket # 40-2 at 285.  Although McCarthy testified that he did not care who was doing call outs as long as the work was being completed (see Docket # 40-21 at 120), Zimmerman testified that it was his perception that McCarthy did not like Dias, treated him differently than he treated other managers, did not want Dias to cover Zimmerman's shifts, and that he told Verizon security that McCarthy did want Dias in particular to get overtime "to pay his new house."  Docket # 40-26.  McCarthy also excluded Dias from a manager's meeting when the overtime and call out lists were under discussion, an exclusion that Zimmerman found to be without justification or obvious cause.  Id. at 43-45.

17

In June, 2008, McCarthy and Dias had a confrontation over Dias's crew's overtime which culminated in a Verizon security investigation and McCarthy's apology to Dias. Docket # 32-2 at 39-40; Docket # 40-33 (security investigation record). Significantly, at the outset of his interview by Verizon security, McCarthy was informed that "the purpose of the interview was to discuss an incident that took place at 6-4-08 at the Plymouth garage between himself and Neal Dias." Id. Before security began interviewing him about the incident, however, McCarthy told the investigators that he was "sick and tired" of Dias and informed them that "Dias has previously filed a discrimination case and security could check with Patty Regan and Jean Galanis." Id. The investigators "explained to McCarthy that he should hold his thoughts about Mr. Dias until later" when they had described the allegations to him. Id.

Crediting Dias' account of McCarthy's various actions and in light of McCarthy's references both to Dias' "history" and his prior discrimination complaint, a jury could reasonably find evidence of McCarthy's retaliatory animus toward Dias. Thus, Dias has met his burden in establishing a prima facie case (to the extent he must prove his case by indirect evidence).

Indirect Evidence of Pretext

Verizon argues that no reasonable jury could conclude that McCarthy's stated reasons for identifying Dias for layoff were pretextual and masked discriminatory animus because Dias offers no evidence of pretext beyond his own subjective belief that he was a good manager and should not have been laid off, which is insufficient as a matter of law. Docket # 30 at 11-12.

The law and the facts undermine Verizon's position. Verizon's reliance on Vega v. Kodak Caribbean, Ltd., 3 F.3d 476, 479 (1st Cir. 1993) for the proposition that Dias must adduce evidence of discriminatory animus itself is misplaced. The Vega plaintiff had advanced a

18

wrongful termination claim under the federal Age Discrimination in Employment Act of 1967 and Puerto Rican law. Id. at 478. In contrast, Dias here relies solely upon Massachusetts law, and the Massachusetts Supreme Judicial Court has specifically rejected the notion that plaintiffs bringing claims pursuant to chapter 151B must adduce evidence of the type here demanded by Verizon. "The phrase 'pretext for discrimination' implies that the plaintiff must prove not only that a reason given by the employer for the adverse decision was false, but that the reason was given to cover a discriminatory animus. Our decisions do not require this." Lipchitz v. Raytheon Co., 434 Mass. 493, 500-01 (2001). Rather, if the fact finder is persuaded that one or more of the reasons advanced by the employer for its adverse employment actions is false, it may (but need not) infer that the employer is covering up a discriminatory intent, motive or state of mind. Id. at 501; see Douglas v. J.C. Penney, 474 F.3d 10, 14 at n.2 (M.G.L. ch. 151B "appears to be slightly less stringent, in that it would allow a plaintiff to overcome a motion for summary judgment if the plaintiff shows that just one of the proffered reasons was pretextual").[5]

Turning to the facts, Dias has submitted the evidence required under state law. With respect to one of McCarthy's stated criticisms of Dias at the reduction in force meeting (that Dias "was not meeting his performance objectives"), Dias points to Verizon's monthly productivity rankings, in which each manager's productivity on each of their assigned work tasks was graphed, and the managers ranked. According to second level manager Galanis, Verizon valued this ranking:

----

[5] In interpreting c. 151B, Massachusetts courts may look to the interpretations of analogous federal statutes, but are not bound by interpretations of the federal statute in construing the State statute. See College-Town, Div. of Interco, Inc. v. Mass. Comm'n Against Discrimination, 400 Mass. 156, 163 (1987) (citing Mass. Elec. Co. v. Mass. Comm'n Against Discrimination, 375 Mass. 160, 167 (1978)).

these productivity rankings/results were used on the performance evaluations for our first levels. It was clear to me that the higher you were on this list the more your competence was valued as a manager. When facing the prospect of laying off first levels, it would only make sense to retain the workers who fell toward the top of the productivity list in their local area. I cannot stress enough how it was impressed on management that these productivity rankings were important to our well being at Verizon.

Docket # 38, Exhibit 29 at ¶ 10.

Dias did well on this productivity ranking, placing second among McCarthy's six first level managers for the June, 2008 year-to-date rankings. Docket #38 at Exhibit 29. Moreover, McCarthy's ranking of his managers for termination purposes matched this productivity ranking exactly, except in the case of Dias. That is, Dias (the second most-productive manager) was designated number two for layoff, after McCarthy's least productive manager.[6]

In the face of this evidence, McCarthy affirms that he did not utilize the performance reports Dias cites in compiling his first level managers' performance reviews. Docket # 34 at ¶ 51. This is clearly not the case. McCarthy's 2007 performance review of Dias quotes the ranking Dias cites. Docket # 38 at Exhibit 9 ("Neal was rated 16th out of 69 local managers during the first half of 2007, earning a "Performing" rating for first half 2007 . . ."). Verizon argues that McCarthy referred at the reduction in force meeting not to the productivity rankings, but to his

_____

[6] McCarthy's layoff designations were Ellis, Dias, Gittens, Hill and then Zimmerman while the productivity discussed in the text ranked them (from least to most productive) Ellis, Gittens, Hill, MacDonald, Dias, Zimmerman. MacDonald was ranked after Dias on the productivity rankings, but she had left prior to the layoffs. Docket # 40-29.

Verizon challenges the productivity ranking on another front as well. It asserts in its reply memorandum that of all of the laid off first level managers, two ranked above Dias in the productivity analysis Dias cites (although these two were not supervised by McCarthy). Dias fairly and properly noted at the hearing that no admissible evidence supports the assertion Verizon made about the other two employees. Were Verizon to have admissible evidence, that evidence would not change the outcome on summary judgment as the employees did not work for McCarthy.

own productivity objectives for Dias, a separate metric. In light of the evidence of the importance to and ongoing use by Verizon (including McCarthy) of the productivity measures Dias' cites, Dias has presented a genuine issue of material fact regarding the productivity measure relied upon by McCarthy.

McCarthy also affirms that in the meeting, "Galanis, to whom Plaintiff reported for a brief period in 2007, echoed my observations that Plaintiff was an appropriate candidate for layoff based on her experiences as his former supervisor." Docket # 34 at ¶ 66. Galanis, in contrast, affirms that "[d]uring this meeting, I did not make any comments about Neal's productivity or objectives because I had no negative experiences with these. When I was asked about Neal, I basically referred vaguely to my May, 2007 write up about Neal. That's all I said about Neal because he worked for me for a short time."[7] Docket # 38, Exhibit 29 at ¶ 8. In short, she disputes McCarthy's assertion that she said that Dias was an appropriate candidate for layoff.

McCarthy also asserted Dias's "was not engaged as a manager," yet Galanis attests that during the 2-3 month period in 2007 during which she managed Dias, he was "fully engaged with the technicians that worked for him. He was out in the field doing his job. He was a team player as he was willing to share information and help the other managers and the technicians . . . I had no issues with the manner in which Neal filled out time sheets. He had a good sense of his jobs and he met his productivity objectives." Id. at ¶ 4.

Finally, according to Fennell, Dias was a "top performer" among his first level managers

---

[7] Galanis affirms that "there were two main issues that occurred during the time Neal worked for me" – his purchase of food for his workers during an overnight call and the need to "be mindful of his overtime budget." Docket # 40-30 at ¶ 5. The review she wrote is critical of additional areas ("holding techs accountable," "attendance administration," "DOT compliance," "leadership abilities"). See Docket # 32-12 at 2.

in 2004 whom he considered an extremely hard worker and a very good manager, until the incident with Best occurred. Docket # 40-6 at 117. While this was a four-year-old assessment at the time of the lay off decision, it has evidentiary significance in that a jury may consider whether the change in assessments of Dias coincided with his first complaints of racial discrimination.

Considering all of the evidence in the light most favorable to Dias, a reasonable jury could reject as false several of the reasons advanced by Verizon for laying off Dias.[8] From that conclusion and in the context of this case with evidence both of McCarthy's references to Dias' complaints and the apparent shift in evaluations of Dias after his complaints, a jury, under the applicable Massachusetts law, could permissibly infer that retaliation for Dias' protected activity caused his termination. Lipchitz, 434 Mass. at 501.

One further issue requires discussion. Verizon also contends that the pay raise Dias received in 2007 and the lengthy period that elapsed between Dias's filing of his MCAD complaint and his layoff precludes any causation finding. Plainly, Dias bears the burden to establish that retaliation was the "determinative cause" of the layoff which, under Massachusetts law, he may establish by "by persuading the fact finder that it was more likely than not that at least one reason [articulated by the defendant for the adverse employment action] was false." Lipchitz, 434 Mass. at 506-507. While the period of time that elapsed supports Verizon's position (see Benoit v. Technical Mfg. Corp., 331 F.3d 166, 175 (1st Cir.2003); Mesnick v. Gen.

_____

[8] The evidence on these points is far from clear. There is no affirmative evidence that the productivity ranking Dias cites was discussed at the layoff meeting and notations in yearly evaluations of Dias failing to meet all his productivity objectives. One asserted reason for Dias's layoff was a lack of leadership skills, a problem noted by Galanis in her 2007 review of Dias. And of course a jury might reasonably credit McCarthy's explanation. When viewed in the light most favorable to Dias, however, the totality of the evidence reveals a triable issue of material fact.

Elec. Co., 950 F.2d 816, 828(1st Cir.1991)), it is not sufficient, in this case, to warrant summary judgment.  As noted, Dias has submitted evidence of pretext (something not present in the cited cases).

Thus, I RECOMMEND that the Court deny Verizon's motion with respect to Count III.[9]

B.     Count I - Hostile Work Environment

Verizon maintains that Dias cannot succeed on his hostile work environment claim because his workplace was not objectively hostile and because Dias cannot make a sufficient showing of retaliatory animus.

In addition to enabling a plaintiff to bring suit for unlawful acts of discrimination, M.G.L. c. 151B, has been interpreted to provide a cause of action for a hostile work environment based on the cumulative effect of a series of abusive acts, even though each in isolation might not be actionable in itself.  Windross v. Village Automotive Group, Inc., 71 Mass.App.Ct. 861, 863 (2008) (citing Clifton v. Mass. Bay Transp. Authy., 445 Mass. 611, 616 n. 5 (2005)). To prevail on this claim, Dias is required to establish that he endured a work environment pervaded by harassment or abuse that unreasonably interfered with his work performance, and that such conduct was sufficiently severe and pervasive to interfere with a reasonable person's work performance.  Id. (citing Muzzy v. Cahillane Motors, Inc., 434 Mass. 409, 411 (2001). "This 'objective' reasonable person standard has been interpreted to mean that the evidence of  . . . harassment is to be considered from the 'view of a reasonable person in the plaintiff's position.' " Id. (quoting Muzzy, 434 Mass. at 411–412 (quoting Ramsdell v. Western Mass. Bus Lines,

_____

[9]  Although Dias raises other theories in support of retaliation claim, because I conclude that he has raised a triable issue with respect to his termination, it is unnecessary to analyze these theories separately.

Inc., 415 Mass. 673, 677 n. 3 (1993))). "Because a hostile work environment claim is a distinct theory of recovery requiring additional elements of proof beyond a showing of discrimination, when it is claimed along with individualized claims of discrimination, the claims must be analyzed separately." Windross, 71 Mass.App.Ct. at 863.

"An employer who passively tolerates the creation of a hostile working environment implicitly ratifies the perpetrator's misconduct and thereby encourages the perpetrator to persist in such misconduct, whatever the employer's precise legal relationship to the perpetrator." Modern Continental/Obayashi v. Massachusetts Comm'n Against Discrimination, 445 Mass. 96, 105 (2005); See also College–Town, 400 Mass. at 167–168 (an employer who fails to take remedial action after notification of harassment is liable therefor).

Verizon argues that Dias's allegations of harassment are insufficiently severe or persuasive to be actionable when viewed objectively, because rather than constituting a pattern of harassment which posed a barrier to Dias's full participation in the workplace (see Ramsdell, 415Mass. at 677), Dias's allegations are more akin to non-actionable "petty slights suffered by the hypersensitive." Docket # 30 at 15-16 (quoting Weston v. Town of Middleborough, 2002 WL 243197, *9 (Mass. Super. Ct. Feb. 15, 2002)). McCarthy's confrontation with Dias, it says, is a general allegation of rudeness or ostracism which is insufficient to support a hostile work environment claim. Docket # 30 at 15 (citing Carmona-Rivera v. Puerto Rico, 464 F.3d 14, 19 (1st Cir. 2006)). Similarly, it argues that Dias's allegation that "he chafed under the close supervision of Mr. McCarthy and Ms. Galanis" is insufficient to support a hostile work environment claim. Id. at 16 (citing Hall v. FMR Corp., 667 F. Supp. 2d 185, 201 (D. Mass.2009)). Finally, it asserts that the fact that McCarthy provided Dias with a positive review

in 2007, in combination with the fact that Dias received a bonus and a raise, belies his claim of a hostile work environment posing a barrier to his full participation in the workplace.

Nonetheless, a number of facts support Dias' hostile work environment claim. Verizon never told Dias the result of its investigation into his claim of racial discrimination.[10] Dias reiterated his request to learn the result of the investigation on February 27, 2007. He never received a response to that request.

Dias's allegations are not confined to the discrete acts identified by Verizon as insufficient to support a hostile work environment claim, but rather include numerous acts alleged to form a pattern of conduct. See the recitation of events between McCarthy and Dias, supra, at 15-17. Additionally, in the light most favorable to Dais, the non-moving party, the record reveals that Best and Benvie made racially insensitive comments in Dias's presence in 2004-05, and that he complained to his supervisor, Fennell. Fennell responded to Dias's frequent inquiries concerning the progress of his investigation with stonewalling. Dias then escalated his complaint to Fennell's supervisor, Glynn. Fennell's assistant also complained to Fennell and Glynn about Best and Benvie's treatment of Dias and another minority manager, and urged them to take action on Dias's behalf. Instead, Fennell washed his hands of the matter, saying "I'm not getting in the middle, let them hash it out." The situation worsened with further conflict between Best and Dias concerning her discipline of his technicians, which ultimately led to Dias's transfer to another garage. That transfer was itself the subject of a second internal complaint by Dias, in which he alleged that he had been racially harassed by Best, Benvie and Best's daughter. Docket # 40 at

---

[10] There is a genuine dispute of material fact between Dias and Verizon over whether Verizon told Dias the results of the investigation in August 2006. For summary judgment purposes, Dias's assertion that he was not told prevails over Verizon's witness's claim that he was told.

Exhibit 15.    The investigator who handled Dias's complaint testified that in his view, Dias's complaint were primarily interpersonal, rather than racial.  Docket # 40 at Exhibit 4.  The investigator did not interview either Best, Benvie or Best's daughter.  Id.  While Dias's February 27, 2005 letter initiating his internal complaint is somewhat prolix and indeed references many workplace issues unrelated to race, it also unquestionably alleges racial discrimination.  See Docket # 40, Exhibit 15.

For example, the letter begins with several paragraphs relating that Dias had not previously experienced racial discrimination either in his early life (in a white-dominated town and school system) or in his military service, but that in contrast during his employment with Verizon, his "career as a manager has been wrongfully targeted; I have been harassed, discriminated against and victimized based on my age and race."  Id. at 1.  Dias unambiguously describes Best as racist.  "Anne's is [sic] very vocal about the people she hates and it seems as though it is more frequent about people of color.  Her racism stands out loudly as the problems with minorities in the garage as clear [sic]."  Id. at 6.  With respect to his transfer to a new garage, Dias complained that the transfer was implemented even though charges made against him by Best were found to be unfounded, stating "if I was a white man was in this situation and this claim was unfounded would I have been moved?"  Id. at 9.  He added, "Malcolm Benvie and Ann Best . . . are racist people who are totally against the growth of this company through diversity and they both discriminate against people of color."  Id. at 11.  "I am filing a complaint and charges against  . . . Malcolm Benvie for discriminating against me for my age, color, race and lack of management experience" . . . "against Ann Best for discrimination against me and other minorities within our company."  Id. at 12-13.

While it is true that, as Verizon argues, Dias was informed that the investigation was complete in 2006 (i.e., outside of the limitations period), it is also clear that he was not informed of the result of the investigation, and continued to make specific inquiries demanding to be informed of its outcome, inquiries which continued into the limitations period. Dias could hardly have assessed the adequacy of Verizon's response to his complaints when he had not been informed of that response.

There is a genuine dispute of material fact as to whether the investigation conducted by Verizon into Dias's complaints was adequate with respect to his complaints of race-based misconduct by Verizon employees, and as to whether McCarthy created a hostile work environment for Dias in retaliation for his past complaints.

C. Count II - Discrimination on the Basis of Race

Dias makes the following race based claims:

1. that the warning and transfer he received for his behavior toward Best in 2004 was racially motivated, especially when contrasted with Verizon's treatment of McCarthy after the overtime confrontation in June 2007;

2. that the inferior review he received for 2006 (signed by both Dias and McCarthy on February 20, 2007) compared to his white counterpart MacDonald arose from disparate treatment due to his race;

3. that he endured a racially hostile work environment from February 2004 until his transfer in early 2005; and

4. that Verizon's failure to conduct an adequate EEO investigation into his complaints regarding the 2004 hostile work environment is itself a form of

racial discrimination.

Three of these claims are untimely in this 2010 complaint under chapter 151B's three year statute of limitations unless saved by the continuing violations doctrine. Claims brought pursuant to M.G.L. c. 151B must be brought "not later than three years after the alleged unlawful practice occurred." M.G.L. c. 151B, § 9. The statute of limitations begins to run at the precise moment of the act of discrimination. Ocean Spray Cranberries, Inc. v. Mass. Comm'n. Against Discrimination, 441 Mass. 632, 641 (2004). Thus, barring applicable exceptions, claims based upon discriminatory acts prior to February 18, 2007 (that is, all but one of the acts of racial discrimination alleged by Dias) are untimely.

Dias invokes the exception applicable to so-called "continuing violations." Docket # 37 at 3-4. "This exception recognizes that some claims of discrimination involve a series of related events that have to be viewed in their totality in order to assess adequately their discriminatory nature and impact." Cuddyer v. Stop & Shop Supermkt. Co., 434 Mass. 521, 531 (2001). Courts "have relied on the continuing violation doctrine to permit plaintiffs to seek damages, if the alleged events are part of an ongoing pattern of discrimination, and there is a discrete violation within the . . . limitations period to anchor the earlier claims." Id. at 531–532. For the exception to apply, Dias must prove that

> (1) at least one discriminatory act occurred within the . . . limitations period; (2) the alleged timely discriminatory acts have a substantial relationship to the alleged untimely discriminatory acts . . . [; and] (3) earlier violations outside the . . . limitations period did not trigger [the plaintiff's] 'awareness and duty' to assert his rights, i.e., that [the plaintiff] could not have formed a reasonable belief at the time the employment actions occurred that they were discriminatory.

> Ocean Spray, 441 Mass. at 643.

Dias advances one act of racial discrimination during the relevant three year period, the

racially disparate review he received from McCarthy compared to MacDonald. This is, at most, a solitary act of racial discrimination lacking a "substantial relationship" to the earlier racial discrimination alleged. The review was the product of a different manager, in a different garage two years after the end of the other alleged racial discrimination. Thus, the untimely claims of discrimination are not saved by the continuing violations exception.

Dias also seems to contend that he can rely upon an act of retaliation as the anchoring act for the continuing violation exception to save the otherwise untimely acts of alleged racial discrimination. This is true as a principle where the plaintiff can show the discrimination and retaliation emanated from the same discriminatory animus, however, "[m]ost often, retaliation is a distinct and independent act of discrimination, motivated by a discrete intention to punish a person who has rocked the boat by complaining about an unlawful employment practice." Noviello v. City of Boston, 398 F.3d 76, 87 (1st Cir.2005). Such is the case here. The retaliation alleged here involved different persons. Moreover, "nothing in the record indicates that these retaliatory acts were undertaken for reasons related to the plaintiff's" race. Id. Thus, Dias cannot rely upon the retaliation to revive the untimely discrimination claims.

Accordingly, all of Dias's race based claims are barred by the statute of limitations except for his claim of disparate treatment with respect to the performance review he received from McCarthy on February 20, 2007. On the merits of that claim, Verizon seeks summary judgment contending that the different reviews for McCarthy and Dias are explained by a legitimate business reason – namely that MacDonald's more substantial experience enabled her to perform at a higher level more quickly. Dias, nonetheless, contends that racial discrimination caused the review he received. Even viewing all of the facts in the light most favorable to Dias, no

reasonable jury could conclude that the review he received was caused by discriminatory animus on the basis of race. Dias has presented no other evidence of any type suggesting that McCarthy harbored racial bias. Although he has identified many respects in which alleges that McCarthy mistreated him, he has specifically denied any racial component to his termination, the events on the evening of the technician's death or the confrontation over his crew's overtime (attributing these instead to retaliatory animus). The undisputed evidence also establishes that McCarthy responded properly to a racial remark uttered by another employee. The explanation presented for Dias's evaluation is undisputed (that is, that Dias had less than six months in the position) and plausible on its face. Nothing in the record suggests that this reason was anything more than a general guideline to follow, absent other material information (such as MacDonald's substantial and undisputed prior management experience).

Thus, I RECOMMEND that the Court ALLOW the Motion for Summary Judgment as to Count II with respect to the claim of racial discrimination arising from the February, 2007 review Dias challenges, and find that the remainder of the claims advanced are barred by the applicable statute of limitation.

III.    CONCLUSION

For the foregoing reasons, I RECOMMEND that the Court ALLOW IN PART Verizon's Motion for Summary Judgment (Docket #29) and DENY it IN PART.  I RECOMMEND that the Court ALLOW the motion with respect to Count II and DENY the Motion with respect to Counts I and III.[11]


              /s / Leo T. Sorokin
              UNITED STATES MAGISTRATE JUDGE

---

[11]  The Parties are hereby advised that any party who objects to these proposed findings and recommendations must file a written objection thereto within 14 days of receipt of this Report and Recommendation.  The written objections must identify with specificity the portion of the proposed findings, recommendations, or report to which objection is made, and the basis for such objections.  See Fed. R. Civ. P. 72 and Habeas Corpus Rule 8(b).  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation.  See Keating v. Secretary of Health and Human Services, 848 F.2d 271 (1st Cir.1988); United States v. Emiliano Valencia-Copete, 792 F.2d 4 (1st Cir.1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603 (1st Cir.1980); United States v. Vega, 678 F.2d 376, 378-379 (1st Cir.1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir.1983); see also Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466 (1985).